IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TRAVON MCCOY #843971    :

 v.          : CIVIL ACTION NO. DKC-04-480

RICHARD MORGAN and    :
THE ATTORNEY GENERAL OF THE
  STATE OF MARYLAND   :

## MEMORANDUM

Now before the court is a habeas corpus petition filed by Travon McCoy[1] (Paper No. 1); the State's Answer (Paper No. 10); and Petitioner's reply thereto.[2] (Paper No. 11). After review of these papers, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts.* For the reasons that follow, the petition will be denied.

## Procedural History

On December 8, 1999, Petitioner, Ismail Malik Wilson, and Robert Lamont Bryant were indicted on five counts of first degree premeditated murder, various handgun crimes, robbery with a dangerous and deadly weapon, robbery, first and second degree assault, and the theft of property. (*See* Paper No. 10, Exhibit 1 and Exhibit 15 at 1-2). Each defendant was indicted separately for conspiracy to commit murder.[3] (*Id.*). On June 29, 2001, a Baltimore City Circuit Court jury convicted Petitioner of five counts each of first degree murder, felony murder, conspiracy to commit

---

[1] Although convicted by the State of Maryland, Petitioner is serving his sentence at the Washington State Penitentiary in Walla Walla, Washington.

[2] Pursuant to the dictates of *Thompson v. Greene*, 427 F.3d 263 (4th Cir. 2005), Respondents provided Petitioner with a copy of all exhibits in this case. Paper No. 13. Petitioner was provided thirty days after receipt of the exhibits in which to file a supplemental reply (Paper No. 12), but has chosen not to respond.

[3] Tariq Abdul Malik, Wilson's brother, was also indicted but tried separately.

murder, conspiracy to kidnap, conspiracy to rob, and use of a handgun in the commission of a

felony. (*Id.*, Exhibit 15 at 3). Petitioner was sentenced to five consecutive life sentences without

the possibility of parole for the five counts of first degree murder.[4] (*Id.* at 4-5).

On appeal, Petitioner raised various issues, including a claim that he had been denied a

speedy trial in violation of the Sixth Amendment. (*Id.*, Exhibit 13 at 2, 13-15). On December 24,

2001, the Maryland Court of Special Appeals rejected Petitioner's claim and affirmed all his con-

victions, except for the convictions for conspiracy to rob and conspiracy to kidnap. (*Id.*, Exhibit 15

at 44, 84). Petitioner sought further review in the Maryland Court of Appeals, raising various claims

and again arguing that he had been denied his Sixth Amendment right to a speedy trial. (*Id.*, Exhibit

17). On April 11, 2003, that court declined *certiorari* review. (*Id.*, Exhibit 19).

The brutal crime is well summarized in the opinion of the intermediate appellate court:

> Alvin Thomas*   testified that, on December 5, 1999, at
> approximately 6:00 p.m., he arrived at 1231 Gusryan Street,
> Baltimore, Maryland. ** When Thomas knocked on the front door,
> Wilson answered and grabbed Thomas by the coat, pulling him into
> the house. Thomas further testified that he was struck on the head
> after which Wilson and Bryant pushed him down the stairs. McCoy
> and Tarek were also on the premises at this time, and all four men
> were armed. They demanded drugs and money. Thomas surrendered
> the three hundred dollars he had on his person. Appellants removed
> Thomas's leather jacket from his body and took his diamond watch,
> diamond bracelet, diamond ring, wireless phone, and pager.
>
> Appellants then discussed whether Thomas was lying about not
> having any drugs or more valuables and contemplated going to
> Thomas's residence. Thomas called a friend-Darnell Collins-at
> appellants' request in order to obtain drugs, valuables, or money.
> Thomas and Collins agreed to meet at the McDonald's Restaurant on

---

[4]     The felony murder convictions were merged with the first degree murder convictions. Additional incarceration
was imposed for the other convictions. *Id.*

Greenmount Avenue. Following Thomas's conversation with Collins, Bryant asked Thomas, "What's over Lo's House?"*** Although Thomas responded that he did not know, appellants retrieved Thomas's keys from his coat and placed Thomas in the back seat of his own car at gunpoint.

They all proceeded to Matthews's home at 3535 Elmley Avenue in Thomas's car; Bryant drove. Appellants walked Thomas to the front door, still at gunpoint, placed him at the front of the group, and rang the doorbell. Jenkins-Thomas's niece-came to the door. Bryant, who had been crouching down behind Thomas, stood up and placed a gun to Thomas's head. Bryant then opened the door and told Jenkins "to back up." All of the appellants and Thomas entered the home. McNeil and Spearman were also on the premises. Appellants demanded that McNeil lay on the floor and, when he did not immediately comply, they began kicking him. Appellants led Thomas and McNeil downstairs and, consequently, found Spearman lying on a bed in the basement. Spearman left the bed at their request. Bryant slapped her and told her to go upstairs to the first floor. Thomas, Jenkins, Spearman, and McNeil were instructed to lie down.

Bryant inquired as to what, if any, drugs, money, or valuables Matthews had in the house. No one knew ostensibly because Matthews routinely locked her bedroom door, to which only Matthews and one other individual had keys. Bryant further inquired as to which room belonged to Matthews. He subsequently led Jenkins upstairs. Wilson led Thomas upstairs, but stopped him on the steps. Thomas watched as Bryant and McCoy kicked Matthews's bedroom door in and began "looking around in there [and] throwing stuff."

Appellants were unable to find anything of value and began inquiring as to the whereabouts of the two individuals who occupied the room. Thomas was instructed to call Matthews and, when he complied by calling her wireless phone, Matthews reportedly told Thomas that she was on her way back to the house. When Matthews arrived at 3535 Elmley Avenue, Thomas opened the door and Bryant placed a gun to Thomas's head. Bryant pulled Matthews into the house by her shirt. Thomas further testified that, as Collein walked up the stairs approaching the door, she was looking away and did not see what was happening in the door way. Wilson instructed Collein to come inside the house. Alston also did not foresee the danger ahead and, as she was carrying bags into the house, McCoy went outside and instructed her to "get up here." Collein's car, in which the victims had

been traveling, was double parked outside the house with the car door still open.

According to Thomas, appellants had everyone inside at this point lying on the floor. Bryant asked Matthews, "Where the shit at [sic]?" ****  In response, Matthews repeatedly asked, "What's going on?" When Matthews did not tell appellants where to find drugs, money, or valuables, they threatened to shoot her daughter-Jenkins. Thomas asked them to take whatever they wanted in exchange for the safety of his family and then instructed Matthews to give appellants whatever she had. Appellants subsequently escorted Matthews upstairs; when they returned, Bryant was "pushing" money into his pockets.

Appellants then ordered the victims downstairs. Bryant went outside to move the car to the back of the house. Matthews made an attempt to talk with appellants and offered to take them to the bank. They declined and Bryant responded, "I didn't forget that shit you did to me." The exchange continued briefly and ended when appellants began laughing. Thomas further testified that Wilson then escorted him upstairs upon Bryant's instruction. Wilson and Bryant then took Thomas outside and they entered Thomas's car, which was parked at the rear of the house near the walkway.  Bryant and Wilson exchanged firearms and Bryant went back into the house. Approximately thirty seconds later, Thomas testified, he heard four gunshots coming from the house. Shortly thereafter, Thomas saw appellants run from the house and enter the car. Bryant asked, "Who capped Lo?" *****  McCoy answered, "I did. I did."

They proceeded to a nearby McDonald's Restaurant on Greenmount Avenue. Two of the passengers exited the car awaiting Collins's arrival. Appellants asked Thomas, "Where's he at [sic]?" Thomas responded, "He's coming." They drove to a telephone booth in order for Thomas to call Collins again. Both telephones were out of service, however, and Collins arrived before Thomas had an opportunity to telephone him. Collins backed his car into a parking space. Bryant drove close to Collins's car, blocking the car's movement and preventing Collins from leaving.

Thomas testified that Collins observed Bryant's driving and, when Wilson exited  the car, Collins quickly alighted from his car and ran. Wilson and Bryant exchanged guns again and Wilson began chasing Collins. Bryant ordered Thomas to search Collins's car; Thomas complied. As Thomas searched underneath the seats of Collins's car,

4

Bryant asked, "Where is it? Where is it?" Thomas heard gun fire at this time and assumed that Collins had been shot and killed by Wilson.

Thomas indicated to Bryant that what he was looking for could possibly be located inside the trunk of the vehicle. Thomas pulled the latch to the trunk from inside the car and began looking inside the trunk while Bryant continued to hold a gun to Thomas's head. Thomas suggested that the drugs might be located on the side where Bryant was standing. When Bryant looked down, Thomas threw clothing from the trunk over Bryant's head, and began to run with Bryant chasing him. Thomas heard Bryant's gun fall to the ground. He also heard Bryant utter expletives. Bryant, while calling for Wilson's assistance, caught up with Thomas and they began "tussling." Thomas eventually escaped into a nearby bar and the owner telephoned the police.

_____

* Thomas was personally acquainted with appellants and the other victims. He characterized his relationships with them as follows: Thomas had been acquainted with Wilson since 1985 or 1986, and they attended middle school together. Thomas characterized Wilson as one of his best friends. Thomas was familiar with Tarek Malik-Wilson's brother-through Thomas's affiliation with Wilson. Bryant (referred to as "Nae") and Thomas have known one another "since he was a little boy." Thomas has known McCoy (referred to as "Fish") since approximately 1998. Collein was Thomas's mother; Ronald McNeil is Thomas's brother. Matthews (referred to as "Lo") was Thomas's sister. Jenkins (Matthews's daughter) was Thomas's niece. Spearman (referred to as "Stink") was his nephew's girlfriend, and Alston was the girlfriend of another nephew. Additionally, all of the victims were acquainted with one another and all three appellants.

** The address is the home of Adrian Jones, with whom Thomas was engaged in a business enterprise, along with Jones's mother. The business was operated from the residence.

*** Appellants purportedly had bought drugs from Matthews in the past and suspected that she might have drugs and money in her home.

**** In the trial transcript, Thomas explained that appellants were referring to drugs, money, or anything else of value.

***** Thomas explained that he understood this conversation to mean who shot his sister.

*Wilson v. State*, 148 Md.App. 601, 615-619, 814 A.2d 1, 8 - 11 (Md.App. 2002); (Paper No. 10, Exhibit 15 at 8-13).

In the instant petition, his first in federal court,[5] Petitioner asserts that he was denied the right to a speedy trial in violation of the Sixth Amendment. (*See* Paper No. 1 at 5, Memorandum at 2-8). The court finds otherwise, for reasons set forth herein.

## Threshold Considerations

### Timeliness

Respondents do not contend, and the court does not find, that the petition was filed outside the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1).

### Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court.   This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim.  *See* 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal (and thereafter seeking *certiorari* to the Court of Appeals and with other claims by way of  a post-conviction petition, followed by petitioning the Court of Special Appeals for leave to appeal.

Petitioner no longer has any state direct review or collateral review remedies available to him with respect to the claim raised in this court.  For this reason, his claim will be considered exhausted for the purpose of federal habeas corpus review.

---

[5]    Petitioner initially filed this action in the United States District Court for the Eastern District of Washington, which transferred the action here.

**Procedural Default**

Respondents do not assert – and this court does not find – that Petitioner's claim is subject to the procedural default doctrine.   Accordingly, the sole claim raised in the petition will be addressed on the merits.

**Analysis of Petitioner's Sixth Amendment Claim**

**Standard of Review**

Because this petition was filed after April 24, 1996, it is to be decided under amendments to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001).   AEDPA modified the federal court's role in habeas proceedings in order to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law.  *See Bell v. Cone*, 535 U.S. 685, 693 (2002).  Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> 2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).[6]

---

[6]      Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given (continued...)

Section 2254(d) also requires federal courts to give great deference to a state court's factual findings. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). With these standards in mind, the Court will address the merits of Petitioner's claim.

The Supreme Court has found "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." *Barker v. Wingo*, 407 U.S. 514, 523 (1972). Rather, in determining if there has been a constitutional violation of the Sixth Amendment right to a speedy trial, four factors are considered: the length of the delay; the reason for the delay; when the right was asserted; and whether the accused was prejudiced by the delay. *See id.*, 407 U. S. at 530.

---

[6](...continued)
the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

Approximately eighteen months elapsed between the time of Petitioner's arrest and the commencement of trial.  As noted by the Court of Special Appeals, this delay is "presumptively prejudicial" and is sufficient to "trigger" an analysis of the speedy trial issue using the *Barker* factors.[7]  (Paper No. 10, Exhibit 15 at 31; citations omitted).

In examining the reason for delay, the Court of Special Appeals found as follows:

> In the case sub judice, the crimes at issue include multiple counts of conspiracy, robbery, murder, and other related offenses. There are multiple victims, multiple defendants, and numerous witnesses. To be sure, the prosecution was required to gather and prepare for presentation reports of the autopsy examination, ballistic, fingerprint, and DNA examinations. The fact that the case involved three co-defendants and five victims would surely account, to some degree, for an extended period of time necessary for preparation. We are not convinced, however, that the case was of such complexity as to require eighteen months for it to be brought to trial.
>
> Initially we note that, on May 12, 2000, three months after Wilson filed his motion for speedy trial and one month after Bryant filed his motion for speedy trial, the State filed its notice of intent to use DNA evidence. The initial trial date, June 12, 2000, was postponed over appellants' objections that the State had waited six months to submit evidence for DNA testing. Although the initial July 6, 2000 trial date was postponed because of the unavailability of the DNA results-a reason chargeable to the State for not ordering same-the administrative judge also postponed the case for good cause on the basis that counsel for two of the co-appellants were scheduled to try cases in federal court.
>
> After the State filed its fourth and fifth supplemental disclosure on June 14 and 20, 2000, Wilson renewed his motion for a speedy trial on June 23, 2000 and, on June 30, 2000, the State informed the court at the discovery hearing that the results of the DNA tests were not ready. On July 6 and 31, 2000, the State filed its supplemental disclosure VIII and IX. A motion to suppress DNA evidence for failure to comply with Judge Prevas's scheduling order was filed on

---

[7]    The state appellate court noted, however, that "[t]he length of the delay is but one factor in [determining]...whether [Petitioner's] constitutional rights to a speedy trial have been abridged." Paper No. 10, Exhibit 15 at 30.

August 11, 2000. Wilson moved for a postponement due to inability to prepare for trial without discovery.

On August 17, 2000, counsel complained that the supplemental DNA discovery that had been provided did not include the "raw data," "first-generation materials," and the technicians' bench notes. The next day-August 18, 2000-the State filed its supplemental disclosure X. The sixty-day delay between the initial trial date of July 6, 2000 and September 5, 2000 was the result of the State's failure to provide DNA evidence and to otherwise comply with disclosure. We note, however, that Wilson had filed his motion for production of documents and request for discovery on February 2, 2000 and Bryant had filed his motion for production of documents and request for discovery on April 7, 2000, seven months and five months, respectively, after the requests for discovery. Had the prosecution made timely requests to the laboratory for the evidence needed to prepare for trial, the prosecution could have obviated one obstacle to a speedy trial.

On September 5, 2000, the scheduled trial date of September 19, 2000 was postponed four months to January 23, 2001 at the request of appellant Wilson and the fact that Bryant's counsel was engaged in a federal trial. McCoy, however, objected to the postponement. The four-month delay as to Bryant and Wilson is chargeable to the defense. In the interim between September 19, 2000 and January 23, 2001, the State filed supplemental disclosure XI (October 5, 2000), State's supplemental disclosure XII (December 21, 2000), State's supplemental disclosure XIII (January 10, 2001), and State's supplemental disclosure XIV (January 17, 2001).

The motion to dismiss for lack of a speedy trial was denied on January 23, 2001 on the basis that the thirteen and one-half month delay to that point in time was not of constitutional dimension. On that same day, the case was referred to the administrative judge with a recommendation that it be postponed because the State had failed to disclose arguably exculpatory statements of McNeil to Harrison and Figueroa. On January 24, 2001, Judge David Mitchell observed that the State had played discovery "close to the vest" and that the parties were coming dangerously close to a speedy trial violation. Notably, he expressly declined to make a finding of good cause. The postponement "reluctantly" granted on January 24, 2001, was made to permit appellants to file motions to compel discovery on February 26, 2001, which the State answered on March 6, 2001 and June 4, 2001. The four and one-half month delay from January 24, 2001

until the trial began on June 11, 2001 is clearly chargeable against the State for having, as the administrative judge characterized it, "played discovery too close to the vest." Thus, three months under Barker v. Wingo for a complex case would be considered necessary for normal preparation and may be viewed as neutral; four months are chargeable against the defense because counsel requested the postponement for their convenience; six months are chargeable against the State for failure to secure promptly the DNA and other evidence necessary for trial; and three and one-half months are heavily weighed against the State for its lack of diligence in complying with discovery requirements related to ostensibly exculpatory evidence. On balance, we are constrained to conclude that the State acted dilatoriously and therefore much of the reason for the delay must be laid at the doorstep of the prosecution.

\* \* \* \*

With regard to the reasons for the delay, we are troubled that the State requested DNA testing six months after appellants filed motions for discovery. Nevertheless, we are not persuaded that the State's actions constitute misconduct or bad faith. Conflicts with the schedules of the other two defense counsel is a neutral reason for delay. The State's  noncompliance with the discovery schedule is clearly the most egregious violation.

*Wilson v. State*,  148 Md.App.  at 634-637, 814 A.2d at 20 - 21; (Paper No. 10, Exhibit 15 at 31-38).

The appellate court also found that Petitioner "objected to each postponement" and "strenuously asserted" his Sixth Amendment right to a speedy trial.  (*Id.*, Exhibit 15 at 39).

Finally, the appellate court examined Petitioner's claim of prejudice caused by the delay:

Appellants argue that they were prejudiced by the length and nature of their pre-trial incarceration. They were placed on "lockdown" because of the nature of the crimes for which they were accused and, consequently, only permitted to leave their cells for one hour each day. McCoy was in solitary confinement for the majority of his incarceration. Appellants further argue that the value of their witness testimony was diminished in value as a result of the delay. Discussing the weighing of prejudice in a *Barker* analysis, the Supreme Court observed:

11

A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pre[-] trial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his [or her] case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

*Id.* at 532, 92 S.Ct. 2182.

The Court continued, explaining how prejudice is measured:

Two counterbalancing factors, however, outweigh these deficiencies. The first is that prejudice was minimal. Of course, Barker was prejudiced to some extent by living for over four years under a cloud of suspicion and anxiety···· But there is no claim that any of Barker's witnesses died or otherwise became unavailable owing to the delay. The trial transcript indicates only two very minor lapses of memory- one on the part of a prosecution witness-which were in no way significant to the outcome.

*Id.* at 534, 92 S.Ct. 2182.

Of course, appellants endured anxiety and concern, as any normal defendant would react to the uncertainty of pre-trial status and the prospect of incarceration. Further, they, undoubtedly, experienced oppressive pre-trial incarceration and were ineligible for pre-trial release due to the heinous nature of the crimes charged and the threat they posed were they to be granted pre-trial release. The most important factor establishing prejudice, however, is the inability to prepare one's defense. Beyond a general complaint that the value of their witness testimony "was diminished," neither Wilson, Bryant,

Case 8:04-cv-00480-DKC   Document 15   Filed 01/13/06   Page 13 of 13

> nor McCoy contend that witnesses died or specifically had faded
> memories due to the delay. Nor do they point to any other hindrance
> occasioned by their inability to have their cases tried more promptly.
> In view of the complexity and gravity of the case, we accord great
> weight to the lack of any significant prejudice resulting from the
> delay.

*Wilson v. State*, 148 Md.App. at 638-639, 814 A.2d at 22 - 23;  (Paper No. 10, Exhibit 15 at 40-42).

The appellate court went on to balance the four factors, concluding that while much of the delay was

caused by the State's handling of the case, Petitioner was unable to establish that the delay in any

way impaired his ability to present a defense.  (*Id*., Exhibit 15 at 43).

The record supports the intermediate appellate court's application of the balancing test set

forth in *Barker* and its finding that Petitioner did not suffer constitutionally significant prejudice as

a result of the delay.[8]  This finding is presumptively correct, 28 U.S.C.A. § 2254(e)(1)(1996), and

reasonable based upon the record in this case.

Petitioner is not entitled to relief on the basis of his claim.  *See* 28 U.S.C. Section

2254(d)(1996).  Accordingly,  the instant petition for habeas corpus relief will be denied, and this

case will be dismissed by separate order.

  1/13/06                                                          /s/                                    
(Date)                                                         DEBORAH K. CHASANOW
                                                               United States District Judge

---

[8]    Petitioner correctly points out that the appellate court erred in stating that **his** counsel was unavailable on one
occasion due to a trial in federal court.  Rather, counsel for his co-defendants were involved in that trial.  *Compare* Paper
No. 10, Exhibit 15 at 42 with Exhibit 2 at 3-7.  Such error, however, does not mandate a finding that the appellate
court's determination of the speedy trial issue is not correct in all other respects.